UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Criminal No.  03-30114 |
| ) | |
| SUARAWU OLADEJO AMUDA, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT'S NOTICE OF PARTIAL WITHDRAWAL OF OBJECTIONS
COMMENTARY ON SENTENCING FACTORS**

NOW COMES the Defendant, SUARAWU OLADEJO AMUDA (hereinafter "AMUDA," by his attorney, Assistant Federal Defender Douglas J. Beevers, submits the following memorandum describing Defendant's remaining objections and sentencing recommendations.

I. Objections (1)and (2)

(a) Factual Contentions

Mr. Amuda continues to object to being held accountable for 1005 g of cocaine base as relevant conduct as referred to in paragraphs 13, 15 and 27.  Defendant does agree that he can be held responsible for more drug weight than the 5.1 grams which was seized based on some prior sales to the informant.  Defendant contends that it would be unreasonable to increase a sentence from 10 years to 20 years based only on the immunized statement of a cooperating witness.

*United States v. Amuda*
Cr. 03-30114
*Sentencing Commentary*
Page 2

Defendant also notes that although Defendant concedes that the controlled substance he was arrested with was crack cocaine, the Government has no way to prove that the alleged crack which was never recovered was actually crack rather than some other form of smokable cocaine base, which would be treated as "cocaine" under the guidelines. *United States v. Edwards*, 397 F.3d 570, 574 (7th Cir. 2005). In *Edwards supra*, the Court reaffirmed its prior precedent in *Booker, infra* which held that crack and freebase cocaine are chemically identical. *Id.* In *Booker* the Court explained:

> Cocaine hydrochloride may be converted into what is referred to as freebase cocaine or cocaine freebase. Essentially, "freebase" means that the base (cocaine) is "freed" from the hydrochloride and converted into the same chemical state it was in before it became a salt. . . . Freebase can be manufactured in different ways. In the 1970s, freebase would generally be made by dissolving cocaine in ammonia and adding ether or another organic solvent. . . This process, however, is dangerous to both the producer and the user because ether is flammable. . . . A safer process for manufacturing freebase cocaine involves dissolving cocaine hydrochloride in baking soda and water, boiling the mixture until only a solid substance is left, and allowing it to dry. . . The result of this latter process is commonly known as crack. . . Freebase cocaine has a lower melting point than cocaine hydrochloride, so it can be smoked without the active ingredient (cocaine) decomposing. . . . Freebase cocaine, however, is not water soluble (does not dissolve in water), so it cannot be injected or snorted. . . All forms of freebase cocaine, including crack, have the same chemical formula as cocaine: $C_{17}H_{21}NO_4$. *United States v. Booker*, 70 F.3d 488, 491 (7th Cir. 1995).

Without either the drugs or an eyewitness to the manufacturing process the Government cannot prove the drugs alleged in relevant conduct were "crack."

*United States v. Amuda*
*Cr. 03-30114*
*Sentencing Commentary*
*Page 3*

(b) Legal Argument

*United States v. Booker,* 125 S.Ct. 738, 748, (2005) held that Defendant does not have right to jury sentencing, but did not reach the Fifth Amendment question of what standard should be applied to support enhancements made pursuant to the Sentencing Guidelines. Even before *United States v. Booker* some circuits required different standards of proof for proof where large departures were imposed. *See United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990)(holding a district court contemplating a substantial upward departure must require proof of the facts by clear and convincing evidence). Prior to *Booker*, two other Circuits have suggested that clear and convincing evidence might be required where the relevant conduct would dramatically increase a sentence. *United States v. Townley*, 929 F. 2d 365, 369-370 (8th Cir. 1991); *United States v. Restrepo*, 946 F. 2d 654, 661, n. 12 (9th Cir. 1991) (en banc), cert. denied, 503 U.S. (1992); *Restrepo*, 946 F.2d, at 661-663 (Tang, J., concurring), *id.*, at 664-679 (Norris, J., dissenting), *id.*, at 663-64 (Pregerson, J., dissenting) (advocating beyond reasonable doubt standard). The Second Circuit has held that where a large guideline adjustment is supported only by a preponderance standard the sentencing judge should depart downward. *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994).

Prior to *Booker*, the Seventh Circuit has stated that due process may require a higher standard of proof than preponderance in some situations:

*United States v. Amuda*
*Cr. 03-30114*
*Sentencing Commentary*
*Page 4*

> A higher standard might be called for only in the rare instance where a factual finding will result in a sentencing increase so great that the sentencing hearing can fairly be characterized as a tail which wags the dog of the substantive offense." *United States v. Corbin, 998 F.2d 1377, 1387 (7th Cir. 1993).*

Although the Seventh Circuit has not rejected the use of a preponderance standard even when it involved huge increases, it has accepted the principle that relevant conduct increases could be so extreme that a higher burden of proof might be required. *U.S. v. Johnson* 342 F.3d 731, 736 (7th Cir. 2003).

Defendant contends that *United States v. Johnson* should be reconsidered in light of *United States v. Booker, supra*, which requires the sentencing court to consider the factors in 18 U.S.C. § 3553(a).  Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Huge increases in sentences based on weak evidence of relevant conduct create a risk that defendants found guilty of similar crimes will receive drastically different sentences which are unwarranted.  Defendant contends that the use of a higher burden of proof would make this disparity less unwarranted.

Section 3553(a)(2)(A) requires the sentencing court to consider the "seriousness of the offense."  Huge increases in a sentence based on thin evidence of relevant conduct which is not part of the charged "offense" would be unreasonable under *Booker, supra*, for not reflecting the seriousness of the "offense" of conviction.

*United States v. Amuda*
*Cr. 03-30114*
*Sentencing Commentary*
*Page 5*

II. Objection No. (3),(4) and (5)

    Defendant withdraws these objections.

III. Commentary on Sentencing Factors

    1.    Correct Guideline Offense Level:    29 (31 - 3 for acceptance and +1 for the ungrouped firearms offense under §3D1.4)

        Correct Criminal History Category:    V

        Guideline range of imprisonment:    140 - 175 months

    2.    Witnesses. Defendant intends to testify as a witness and to testify that the amount of drug weight should be less than 40 grams of cocaine base.

    3.    <u>Statutory sentencing factors : 18 U.S.C. § 3553(a)</u>

Among the other statutory sentencing factors the Court must consider is "the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The guideline level in this case depends on a 100 to 1 disparity between the recommended range for crack cocaine and powder cocaine. Courts, commentators and the Sentencing Commission have long criticized this disparity, which lacks persuasive penological or scientific justification, and creates a racially disparate impact in federal sentencing. *See, e.g., United States v. Dumas*, 64 F.3d 1427, 1432 (9th Cir. 1995) (Boochever, J., concurring); *United States v. Willis*, 967 F.2d 1220, 1226 (8th Cir. 1992) (Heaney, J., concurring); United States v. Clary, 846 F. Supp. 768 (E.D. Mo.), rev'd, 34 F.3d 709 (8th Cir. 1994); *United*

*United States v. Amuda*
*Cr. 03-30114*
*Sentencing Commentary*
*Page 6*

*States v. Patillo*, 817 F. Supp. 839 (C.D. Cal. 1993); *David A. Sklansky, Cocaine, Race, and Equal Protection*, 47 STAN. L. REV. 1283 (1995); *Matthew F. Leitman*, A Proposed Standard of Equal Protection Review for Classifications Within the Criminal Justice System that Have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines' Classification Between Crack and Powder Cocaine, 25 U. TOL. L. REV. 215 (1994); The Debate on 2002 Federal Drug Guideline Amendments, 14 FED. SEN. REPTR. 123, 188-242 (Nov./Dec. 2001-Jan./Feb. 2002); *Rethinking the Crack Cocaine Ratio,* 10 FED. SEN. REPTR. 179, 184-208 (Jan./Feb. 1998).

The Sentencing Commission has studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported by data. First, while legislators may have intended to target serious drug traffickers, the Commission's data indicate that two-thirds of federal crack cocaine defendants are street level dealers. *Diana Murphy, Statement to Senate Judiciary Committee*, May 22, 2002, reprinted in 14 FED. SEN. RETPR. 236, 237 (Nov./Dec. 2001-Jan./Feb. 2002). Indeed, the 100:1 ratio actually targets low level dealers in a manner inconsistent with the intent of the 1986 Act. Commission data indicate that "aggravating conduct occurs in only a small minority of crack cocaine offenses." *Murphy, supra*, at 238. "For example, an important basis for the establishment of the 100-to-1 drug quantity ratio was the understanding that crack cocaine trafficking was highly associated with violence. More recent data indicate that significantly less systemic violence . . . is associated with crack

*United States v. Amuda*
Cr. 03-30114
*Sentencing Commentary*
Page 7

cocaine trafficking than was reported earlier." Id. More importantly, the prevalence of aggravating factors in crack cases "does not differ substantially from the prevalence in powder cocaine offenses."[1] Id.

Third, the Commission concluded that pharmacological differences between crack and powder do not justify the disparity in penalties. "Cocaine is a powerful stimulant and in any form produces the same physiological and psychotropic effects." Id. at 239. Even the expert who testified before Congress before it adopted the 100:1 ratio acknowledged the absence of reliable evidence indicating that crack was more addictive or dangerous than powder. Clary, 846 F. Supp. at 791-92 (citing testimony of Dr. Robert Byck). Since then, other prominent experts have opined that crack is not more dangerous than powder – in fact, the converse may be true – and that crack is not physically more addictive, though it is possibly psychologically more addictive. *See United States v. Maske*, 840 F. Supp. 151, 155 (D.D.C. 1993); *see also Willis*, 967 F.2d at 1226 (Heaney, J., concurring); *Walls*, 841 F. Supp. at 28. The Commission's most recently obtained evidence confirms that the disparity in penalties is disproportionate to any reasonable assessment of crack's harmful effects. *See* U.S. SENTENCING COMMISSION HEARING, 2/25/02: *Cocaine Pharmacology, "Crack Babies,"* Violence, reprinted in 14 FED.

---

[1]The Commission has also collected evidence suggesting that any "spike" in violence in the mid-1980s was related to the "newness of the market" and has since leveled off. See U.S. SENTENCING COMMISSION HEARING, 2/25/02: *Cocaine Pharmacology, "Crack Babies," Violence,* reprinted in 14 FED. SEN. REPTR. 191, 199 (Nov./Dec. 2001-Jan./Feb. 2002).

*United States v. Amuda*
Cr. 03-30114
*Sentencing Commentary*
Page 8

SEN. REPTR. 191, 193 (Nov./Dec. 2001-Jan./Feb. 2002) (testimony of Dr. Glen Hanson of National Institute on Drug Abuse) (stating that the pharmacological effects of crack and powder cocaine are "very similar"); *see also Murphy, supra*, at 239. Finally, the evidence collected by the Commission shows that, in comparison to the mid-80s, the use of crack has decreased. U.S. SENTENCING COMMISSION HEARING, 2/25/02, *supra*, at 191.[2]

The most troubling effect of the unjustifiably harsh crack penalties disproportionately impact on black defendants, who comprise between 80% and 90% of federal crack cocaine defendants, compared to just 20% to 30% of powder cocaine offenders.[3] *See Murphy, supra*, at 239; U.S. SENTENCING COMMISSION HEARING, 2/25/02, supra, at 205 (testimony of Wade Henderson of the Leadership Council on Civil Rights); *see also Clary*, 846 F. Supp. at 786; *Walls*, 841 F. Supp. at 28; *Maske*, 840 F. Supp. at 154; *Patillo*, 817 F. Supp. at 843 n.6. This is so despite the fact that statistics suggest that the majority of crack users are white. *See Clary*, 846 F. Supp. at 787 n.68 (citing National Institute on Drug Abuse statistics).

Primarily as the result of the different penalties for crack and powder cocaine, and contrary to one of the Sentencing Reform Act's primary goals, the sentencing

---

[2] The Commission has also learned that the phenomena of "crack babies," another horrible discussed when Congress implemented the 100:1 ratio, is essentially a "myth." See U.S. SENTENCING COMMISSION HEARING, 2/25/02, *supra*, at 197 (testimony of Dr. Deborah Frank). Further, there is no evidence that crack is more harmful to unborn children than powder cocaine. *Id.* at 198 (testimony of Dr. Ira J. Chasnoff).

[3] The Commission's data show that only 5% of crack defendants are white, compared to 30% of powder cocaine defendants. *Murphy, supra*, at 239.

*United States v. Amuda*
*Cr. 03-30114*
*Sentencing Commentary*
*Page 9*

guidelines have led to increased disparity between the sentences of blacks and whites. Before the guidelines took effect, white federal defendants received an average sentence of 51 months and blacks an average of 55 months. After the guidelines took effect, the average sentence for whites dropped to 50 months, but the average sentence for blacks increased to 71 months. Spade, supra, at 1266-67 (citing 1993 U.S. Department of Justice, Bureau of Justice Statistics Report).

The Sentencing Commission has repeatedly sought to reduce the disparity. *See* UNITED STATES SENTENCING COMMISSION, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform, at 132* (2004)(Relevant sections are attached as Defendant's Exhibit A); *Diana Murphy, Statement to Senate Judiciary Committee, May 22, 2002*, reprinted in 14 FED. SEN. RETPR. 236 (Nov./Dec. 2001-Jan./Feb. 2002); UNITED STATES SENTENCING COMMISSION, *Special Report to Congress: Cocaine and Federal Sentencing Policy (Apr. 1997)*, reprinted in 10 FED. SEN. REPTR. 184, 189 (Jan./Feb. 1998); UNITED STATES SENTENCING COMMISSION, *Special Report to Congress: Cocaine and Federal Sentencing Policy (1995)*; see also *U.S.* SENTENCING COMMISSION HEARING, *3/10/02: Cocaine Sentencing,* reprinted in 14 FED. SEN. REPTR. 217, 224 (Nov./Dec. 2001-Jan./Feb. 2002) (testimony of Judge Sim Lake on behalf of the U.S. Judicial Conference, in favor of "dramatically lowering the current 100 to 1 crack to powder cocaine ratio"). Most recently, the Commission recommended that the disparity be reduced but not eliminated. In its 2002 proposal, the Commission

*United States v. Amuda*
Cr. 03-30114
*Sentencing Commentary*
Page 10

suggested that the threshold for the 5 and 10 year mandatory minimum penalties be increased from 5 and 50 grams to 25 and 250 grams, respectively. *Murphy*, *supra*, at 240. This recommendation would reduce the disparity ratio from 100:1 to 1 to 20:1.

The 100:1 disparity ratio is even more unwarranted now that the Seventh Circuit has expressly held that the higher crack guidelines do not apply to other equally potent forms of smokable cocaine base which have the exact same chemical composition, but are not made with baking soda such as freebase cocaine. *United States v. Edwards*, 397 F.3d 570, 574 (7th Cir. 2005); *United States v. Booker*, 70 F.3d 488, 491 (7th Cir. 1995).

Defendant contends that it would be unreasonable under *United States v. Booker*, 125 S.Ct. 738, 748, (2005) to impose a sentence based on guidelines reflecting a 100:1 disparity when there is no chemical difference and the Sentencing Commission recommended a 20:1 ratio. If a 20:1 ratio were applied to the 1005 g of assessed in the PSR, the Court could reasonably use a guideline level for 5025 g of powder cocaine, which is level 32. At offense level 32 the ungrouped level 24 firearms offense would add one level, resulting in an offense level of 33, which would be reduced by 3 levels for acceptance of responsibility. At offense level 30 and criminal history V, the guideline range would be 151 - 188 months prison. Defendant contends this is the highest sentencing range which would be reasonable even if the Court found the weight of crack cocaine was proven beyond a reasonable doubt to be over 1000 grams.

*United States v. Amuda*
*Cr. 03-30114*
*Sentencing Commentary*
*Page 11*

                              Respectfully submitted,

                              Richard H. Parsons
                              Chief Federal Public Defender

BY:  s/ Douglas J. Beevers
                              Douglas J. Beevers
                              Assistant Federal Defender
                              600 East Adams Street, 2nd Floor
                              Springfield, Illinois  62701
                              Telephone: (217) 492-5070
                              Fax: (217) 492-5077
                              E-mail: douglas_beevers@fd.org

                        PROOF OF SERVICE

     I hereby certify that on April 13, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

AUSA David Risley
Office of the United States Attorney
318 S. Sixth Street
Springfield, IL 62701

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Ms. Laura Hanner
127 U.S. Courthouse
600 East Monroe Street
Springfield, IL 62701

                              By:  s/ Douglas J. Beevers
                              Douglas J. Beevers
                              Assistant Federal Defender
                              600 East Adams Street, 2nd Floor
                              Springfield, Illinois  62701
                              Telephone: (217) 492-5070
                              Fax: (217) 492-5077
                              E-mail: douglas_beevers@fd.org