# FIFTEEN YEARS OF GUIDELINES SENTENCING

## An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform



UNITED STATES SENTENCING COMMISSION
November 2004



DEFENDANT'S EXHIBIT
CASE NO. _____
EXHIBIT NO. A



*Submitted to*

**Ricardo H. Hinojosa**
*Chair*

**Ruben Castillo**
*Vice Chair*

**William K. Sessions, III**
*Vice Chair*

**John R. Steer**
*Vice Chair*

**Michael E. Horowitz**
*Commissioner*

**Michael E. O'Neill**
*Commissioner*

**Deborah Rhodes**
*(ex officio)*

**Edward F. Reilly, Jr.**
*(ex officio)*

*Prepared by*

**Paul J. Hofer**
**Charles Loeffler**
**Kevin Blackwell**
**Patricia Valentino**

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xviii

Chapter One:  Introduction to the Sentencing Reform Act . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The History of the Sentencing Reform Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        1.    The Roots of Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        2.    Legislative Development of the SRA . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.    Goals and Purposes of the SRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1.    The Goals of Sentencing Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2.    The Purposes of Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    C.    The Commission's Implementation of the SRA . . . . . . . . . . . . . . . . . . . . . . 14
        1.    Guidelines Drafting Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        2.    How the Guidelines Determine the Presumptive Sentence . . . . . . . . . . 16
    D.    Components of the Reformed Sentencing System . . . . . . . . . . . . . . . . . . . . 18
        1.    Components of Guidelines Development . . . . . . . . . . . . . . . . . . . . . . . 19
        2.    Components of Guidelines Implementation . . . . . . . . . . . . . . . . . . . . . 22
    E.    From Theory to Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Chapter Two:  Impact of the Sentencing Guidelines on the Certainty and Severity
                  of Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    A.    Introduction to the Chapter and the Data . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        1.    Sentencing Policy and the Scale of Imprisonment . . . . . . . . . . . . . . . . 38
        2.    Assembling the Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    B.    The Increased Certainty of Imprisonment . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        1.    Historical Development of Use of Imprisonment in the Federal System . 41
        2.    Overall Trends in the Use of Imprisonment . . . . . . . . . . . . . . . . . . . . . 42
    C.    The Increased Severity of Prison Sentences . . . . . . . . . . . . . . . . . . . . . . . . 45
        1.    The Elimination of Parole and the Importance of Time Served . . . . . . 45
        2.    Overall Trends in Sentencing Severity . . . . . . . . . . . . . . . . . . . . . . . . . 46
    D.    Variations Among Different Offense Types . . . . . . . . . . . . . . . . . . . . . . . . 47
        1.    Drug Trafficking Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
        2.    Economic Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        3.    Immigration Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        4.    Firearm Trafficking and Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
        5.    Violent Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
        6.    Sexual Abuse, Exploitation, and Transportation for Illegal Sexual
             Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

| | | | |
|---|---|---|---|
| | E. | Certainty, Severity, and the Scale of Imprisonment | 75 |
| | | 1. Policymaking in the Guidelines Era | 75 |
| | | 2. Sentencing Guidelines: A New Instrument of Policy Control | 77 |

**Chapter Three: Presentencing, Inter-judge, and Regional Disparity** ............................ 79

| | | | |
|---|---|---|---|
| | A. | Introduction | 79 |
| | | 1. Definitions of Disparity | 79 |
| | | 2. Increased Transparency of the Sentencing Decision | 80 |
| | B. | Disparity Arising at Presentencing Stages | 81 |
| | | 1. Presentencing Stages That Can Affect Sentencing Uniformity | 82 |
| | | 2. Surveys Suggest Disparity Results from Presentencing Stages | 85 |
| | | 3. Field Studies Suggest Disparity Results from Presentencing Stages | 86 |
| | | 4. Quantifying the Extent of Disparity Arising at Presentencing Stages | 88 |
| | | 5. Presentencing Stages, Disparity, and the Mechanisms Designed to Control It | 92 |
| | C. | Inter-judge and Regional Sentencing Disparity | 93 |
| | | 1. The Effects of the Guidelines on Inter-judge and Regional Disparity | 94 |
| | | 2. Evidence of Inter-judge and Regional Variation in the Preguidelines Era | 94 |
| | | 3. Research Concerning the Guidelines' Effects on Disparity | 95 |
| | | 4. Recent Research Concerning the Guidelines' Effects on Disparity | 97 |
| | D. | Continuing Disparity Under the Guidelines | 99 |
| | | 1. Continuing Regional and Inter-judge Disparities | 99 |
| | | 2. Mechanisms for Disparity Within the Guidelines System | 102 |
| | | 3. Departures Upon Motion of the Government | 103 |
| | | 4. Variability of Within-Guidelines Sentences | 107 |
| | | 5. Departures for Exceptional Circumstances | 110 |

**Chapter Four: Racial, Ethnic, and Gender Disparities In Federal Sentencing Today** ............................ 113

| | | | |
|---|---|---|---|
| | A. | Examining Group Differences | 113 |
| | | 1. Disparity, Discrimination, and Adverse Impacts | 113 |
| | | 2. A Growing Minority Caseload | 114 |
| | | 3. A Growing Gap in Sentencing | 115 |
| | B. | Studying Racial, Ethnic, and Gender Discrimination in Sentencing | 117 |
| | | 1. Continuing Concern in the Guidelines Era | 117 |
| | | 2. Research on Discrimination under the Guidelines | 118 |
| | C. | Results from Recent Research | 119 |
| | | 1. Racial and Ethnic Disparity | 120 |
| | | 2. Gender Disparity | 127 |
| | | 3. Research on Departures, Sentencing Options, and Placement Within the Guideline Range | 128 |

|   |   |   |
|---|---|---|
| D. | Rules Having Significant Adverse Impacts | 130 |
|  | 1. The 100-1 Powder to Crack Cocaine Ratio | 131 |
|  | 2. Using Prior Drug Trafficking Convictions to Define Career Offenders | 133 |
| E. | Conclusion | 134 |

Chapter Five: Summary and Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

    A.    Substantially Achieved Goals of the SRA . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
           1.    Increased Rationality and Transparency . . . . . . . . . . . . . . . . . . . . . . 136
           2.    Increased Certainty and Severity of Punishment . . . . . . . . . . . . . . . . . 138
    B.    Partially Achieved Goals of the SRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
           1.    Reduction of Unwarranted Sentencing Disparity . . . . . . . . . . . . . . . . . 140
           2.    A High Standard of Sentencing Uniformity . . . . . . . . . . . . . . . . . . . . 142
    C.    Partial Implementation of the Components of Sentencing Reform . . . . . . . . . . . 143
           1.    Components of Guidelines Implementation . . . . . . . . . . . . . . . . . . . 144
           2.    Components of Guidelines Policy Development . . . . . . . . . . . . . . . . . 145


APPENDIX
    A.    Bibliography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
    B     Congressional Directives to the Commission . . . . . . . . . . . . . . . . . . . . . . . . B-1
    C.    Survey of Article III Judges on the Federal Sentencing Guidelines . . . . . . . . . . C-1
    D.    Technical Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1

However, the *extent* of departure for substantial assistance is on average far greater. The mean departure length for substantial assistance was 43 months (or a mean 56 percent decrease from the guideline minimum), while the mean departure length for other downward departures was just 20 months (or a mean 47 percent decrease from the lower average guideline minimum found among offenders receiving these departures).

The relative unimportance of placement within the guideline range above the minimum may also be surprising. Almost 38 percent of offenders received a sentence above the guideline minimum in 2001, and 13.8 percent were sentenced at the guideline *maximum* (USSC, 2001, Tbl. 29). But the average difference between the guideline minimum and the sentence imposed in these cases was just 6.8 months. It should be noted, however, that at the lower end of the sentencing table a six month difference may be the difference between a sentence of simple probation and six months in prison—a distinction of considerable importance to the offenders involved.

A total of just over 82 percent of the variation in individual sentence lengths could be explained by the model. This does not mean that 18 percent of the variation in sentences is unwarranted. The model only identified the relative importance of different mechanisms—how frequently the mechanism is used and how far from the presumptive sentence offenders affected by the mechanism are sentenced. It did not attempt to determine if the mechanisms were being used appropriately and uniformly. For this we must turn to research specific to each one.

### 3.   *Departures upon Motion of the Government*

Several types of sentence reductions can be made only upon motion of the government. Departures from the guidelines and guideline adjustments for various forms of defendant cooperation—such as "substantial assistance in the prosecution of other persons" under USSG §5K1.1, 18 U.S.C. § 3553(e) and Federal Rules of Criminal Procedure, Rule 35(b); participation in an "early disposition program" under USSG §5K3.1 p.s.; and timely "acceptance of responsibility" under USSG §3E1.1(b)—may all be granted only upon motion of the government. Research on several of these mechanisms has revealed considerable regional variation, suggesting that uniform practices have not been in place. Policies put in place subsequent to the PROTECT Act are too new to be evaluated with the data available for this report.

*Downward departures for substantial assistance.* Downward departures for substantial assistance to the government in the prosecution of other persons are made pursuant to USSG §5K1.1. The policy statement permits such a departure only upon the motion of the government, but it does not require that the judge depart whenever the government so moves. Research has shown, however, that judges almost always grant these departures when a motion is made (Maxfield & Kramer, 1997). The rates of substantial assistance motions vary among the districts. In 2002, the national rate was 17.4 percent of all offenders. Five districts had rates twice

> *Rates of substantial assistance departures vary widely among the districts.*

103

as high as the national rate, with three districts having rates over 40 percent (USSC, 2002, Table 26). On the other hand, 12 districts had substantial assistance departure rates less than half that of the national rate, while three had rates of less than five percent.

Policy statement, section 5K1.1 sets out a non-exhaustive list of reasons for judges to consider when determining the appropriate extent of a reduction. However, no detailed nationwide policies governing how substantial assistance motions should be used, nor how the extent of the departure should be determined, have been promulgated by either the Department of Justice or the Sentencing Commission (Lee, 1997; American College of Trial Lawyers, 2001). Case law has established some principles for determining the extent of departure in some circuits.[123] The Commission has received limited reports of standardized discounts in some districts, although in other districts, once a motion is made the determination of the sentence is left entirely to the discretion of the sentencing judge. The majority of sentencing judges reported cases where a defendant had substantially assisted the government, but had not received a motion for a departure on that ground (FJC, 1997).

Given the wide variety of behaviors that can qualify a defendant for a substantial assistance departure, some commentators have suggested that courts are given insufficient guidance regarding the appropriate extent of departure (Berman, 2002; Bowman, 1999). Some have argued that substantial assistance departures are a source of continuing unwarranted disparities (Tease, 1992; Marcus, 1993; Gyurici, 1994; Lee, 1994, 1997), although others have cautioned that differences in rates of departure do not necessarily result in sentencing disparities (Weinstein, 1998; Storto, 2002).

Empirical research on substantial assistance departures is extremely difficult because detailed information on the most important legally relevant consideration—the nature of the defendant's assistance to the government—is available only to the prosecutors familiar with the case. While U.S. attorneys offices are required to document the reasons underlying every substantial assistance motion (DOJ, 1992), these records are not collected into a comprehensive database that can be used for empirical analysis. However, what research has been done indicates that substantial assistance departures may be a source of continuing sentencing disparity.

A comprehensive study of substantial assistance departures was undertaken by the Sentencing Commission in the mid-1990s (Maxfield & Kramer, 1998). It included a survey of U.S. attorney offices' policies on substantial assistance, site visits to eight districts, and an examination of the types of cooperation given by a random sample of defendants receiving substantial assistance departures, as determined by analysis of the presentence reports prepared in the case. The research uncovered irregular and inconsistent policies and practices among the various districts.

---

[123] *See* Federal Judicial Center, *Guideline Sentencing: An Outline of Appellate Case Law on Selected Issues*, § VI.F.2 (2002).

(1)    While every U.S. attorney office reported some review process for the approval of substantial assistance motions, and four out of five offices had written policies regarding the use of substantial assistance motions, review of a sample of cases showed that in practice districts frequently diverged from their stated policies.

(2)    Different U.S. attorneys offices were consistent in authorizing motions for offenders who provided information against other persons, or participated in the investigation of other persons, or testified against them. But different offices varied in whether and how they considered information offenders provided concerning their own criminal conduct.

(3)    Six out of ten offenders who provided some assistance did *not* receive a section 5K1.1 motion, suggesting that prosecutors generally require that the assistance be substantial.

(4)    Offenders at higher levels of a criminal conspiracy are *not* more likely to benefit from a departure for substantial assistance than are lower-level offenders. Although occurring in some specific cases, the so-called "cooperation paradox" in which more culpable offenders receive shorter sentences than less culpable offenders was not common.

(5)    Offenders providing similar types of assistance received varying magnitudes of departure. Offenders with longer presumptive guideline sentences tended to receive greater reductions.

A lower annual rate of substantial assistance departures for Blacks has been a consistent finding in the guidelines era. Minority defendants may, in fact, be less trusting of government officials, less willing to become "snitches" due to pride or fear of reprisal, or less well-positioned to provide useful information than White offenders. Maxfield and Kramer found that Whites and women were more likely to receive a motion after controlling for offense type, guideline range, weapon involvement, and a host of factors relevant to sentencing. However, a re-analysis by Langan (1996, 2001) found that part of the difference between the races was due to their different rates of pleading guilty, and that the statistical significance of the remaining difference was questionable. Neither of these studies could adequately evaluate whether there might be legitimate reasons for differences in substantial assistance departure rates among different groups due to lack of data on the nature of the assistance various offenders provide. Beginning in 1992, Department policy required prosecutors to "maintain documentation of the facts behind and justification for each substantial assistance pleading."[124] No standards for how this information is to be recorded appear to have been promulgated and the data have not been compiled or made available to outside researchers.

---

[124] Terwilliger Bluesheet, *supra* note 43.

***Rule 35 sentence reductions.*** In addition to substantial assistance departures, U.S. attorneys offices can file motions with the court to have previously imposed sentences reduced based upon post-sentencing cooperation by an offender. These are known as Rule 35(b) motions. Data on the use of Rule 35(b) motions or on factors that might account for their use have been very difficult to obtain (Marcus, 1985). The Commission does not reliably receive reports on sentence reductions following the sentencing hearing, so analyses using the Commission's monitoring databases cannot detect their effects on sentences. However, a recent paper using data from the Federal Bureau of Prisons presented the first empirical look at these reductions (Adams, 2003). It suggests that regional variations in practice found with §5K1.1 motions may be present with Rule 35(b) motions as well.

The number of offenders receiving Rule 35(b) sentence reductions has increased dramatically over the guidelines era, from 30 offenders in 1988 to 1,453 offenders in 2000, the last year for which data are available. The average extent of the reduction has remained fairly stable through the years, varying between 30 and 42 percent of the originally-imposed sentence, although the extent varies by district. Drug offenders are by far the most frequent beneficiaries of Rule 35(b), accounting for 80 percent of the reductions. The use of Rule 35(b) varies significantly among the districts. Most districts account for less than one percent of offenders receiving Rule 35(b) reductions in any given year, but in one recent year ten districts accounted for over two percent of offenders receiving the reduction while one district accounted for over 15 percent.

***Downward departures for participation in early disposition programs.*** The Department recently informed the Commission that prosecutors in certain districts have developed early disposition, or "fast-track" programs, that grant participating offenders sentencing concessions.[125] How many districts have employed these programs, and for how long, is not known. These programs offer defendants a sentence reduction, in the form of a downward departure, charge dismissal, or some other benefit, in return for the defendant's waiver of certain procedural rights. These rights might include a prompt guilty plea, a waiver of appeal rights, and in cases involving non-citizens, the defendant's agreement to immediate deportation. Practitioners and commentators have expressed concern that the presence of these programs in some districts, and their absence from neighboring districts, could lead to disparate sentencing outcomes for offenders convicted of similar conduct (USSC Hearing, 2003). The absence of reliable information on the types of cases which are, and which are not, sentenced pursuant to early disposition procedures prohibits analysis of the impact of these programs on sentencing disparity. But as discussed below, the presence of fact track programs in some districts explains a great deal of regional variation in downward departure rates.

The PROTECT Act sought to formalize and standardize these practices. Per the act, the Sentencing Commission authorized a downward departure from the guidelines of "not more than

---

[125] Letter from Eric H. Jaso, Counselor to the Assistant Attorney General, DOJ, to Hon. Diana E. Murphy, Chair, USSC, regarding "Fast-Track Program," August 12, 2003.

The GAO's 1992 analysis also tried to determine whether race or gender accounted for placement within the range, after controlling for some additional factors. The 25 percent sample used in the study was not sufficient to permit controlling for all the factors simultaneously, so analyses were performed using each control variable one at a time. They, too, found that race, gender, age, employment, and marital status did affect placement within the sentencing range. Hispanic defendants were more likely to be sentenced in the middle of the guideline range. Blacks were most likely to receive sentences at the very top or bottom of the range. Women were more likely to be sentenced at the bottom of the range.

Like the evidence of disparity in departure decisions, it is not clear what policymakers should make of these findings. The presumptive sentence analysis, in conjunction with these findings, leaves little doubt that racial and ethnic *disparities* arise when judges decide whether to depart, how far to depart, and where to place an offender within the guideline range. But without data on whether these disparities might be accounted for by legally relevant considerations, it seems premature to conclude that they represent *unwarranted* disparity or discrimination on the part of judges.

## D.  Rules Having Significant Adverse Impacts

Previous sections have evaluated how much of the sentencing gap between various groups is due to discrimination and how much reflects legally relevant considerations that judges are bound to take into account. One other possibility remains: some of the gap may result from sentencing rules that have a disproportionate impact on a particular offender group but that serve no clear sentencing purpose. A rule that serves no clear purpose would be questionable in any event, but rules that adversely affect a particular group deserve extra scrutiny. Chapter Three described how mandatory minimum penalties that trump the otherwise applicable guideline range, such as sentencing enhancements under 18 U.S.C. § 924(c), fall disproportionately on African-American offenders. This section identifies several other sentencing rules that have such an adverse impact.

### 1.    *The 100-to-1 Powder to Crack Cocaine Ratio.*

In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.[136] The average length of imprisonment for crack cocaine was 119 months, compared to 78 months for the powder form of the drug. Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.[137] The reason for the harsher treatment of crack cocaine offenses is the low threshold amounts for five- and ten-year mandatory minimum sentences that are built into the mandatory minimum penalty statutes and incorporated into the Drug Quantity Table of the guidelines, as discussed in Chapter Two. It takes

---

[136] USSC, *Sourcebook* (2002), at Tbl. 34.

[137] *Id.* at Fig. J.

131

100 times as much powder cocaine to get the same five-year sentence as a particular amount of crack cocaine. Under the statutes, five grams of crack cocaine—an amount a heavy user might consume in a weekend with a street value under a thousand dollars—receives a minimum sentence of five years' imprisonment. Crack cocaine is the only drug for which simple possession of greater than five grams, even without an intent to distribute, is treated the same as drug trafficking.

The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine (USSC, 1995; 1997; 2001). The increased addictiveness of crack cocaine is due to its method of use (smoking), rather than to any pharmacological difference between the various forms of cocaine. Powder cocaine that is smoked is equally as additive as crack cocaine, and powder cocaine that is injected is more harmful and more additive than crack cocaine, although cocaine injection is relatively rare. Recent research has demonstrated that some of the worst harms thought to be associated with crack cocaine use, such as disabilities associated with pre-natal cocaine exposure, are not as severe as initially feared and no more serious from crack cocaine exposure than from powder cocaine exposure.

Powder cocaine is easily converted into crack cocaine through a simple process involving baking soda and a kitchen stove. Conversion usually is done at the lowest levels of the drug distribution system. Large percentages of the persons subject to five- and ten-year penalties under the current rules do not fit the category of serious or high-level trafficker that Congress described when initially establishing the five- and ten-year penalty levels. Most crack cocaine offenders receiving sentences greater than five years are low-level street dealers. For no other drug are such harsh penalties imposed on such low-level offenders. High penalties for relatively small amounts of crack cocaine appear to be misdirecting federal law enforcement resources away from serious traffickers and kingpins toward street-level retail dealers (USSC, 1997).

For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward. In 2001 (USSC, 2001) the Commission recommended that the crack cocaine threshold be raised to at least 25 grams from 5 grams, replacing the current 100 to-1 ratio with a 20-to-1 ratio.

As shown in Figure 4.10, this one change to current sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months. Among drug trafficking offenders only, the current gap is even wider—92.1 months for Blacks compared to 57.9 months for Whites—and the reduction would be even greater, 17.8 months. This one sentencing rule contributes more to the differences in average sentences between African-American and White offenders than any possible effect of discrimination. Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it would dramatically improve the fairness of the federal sentencing system.



Figure 4.10: Estimated Time Served 1984-2002
with Projections for Recommended Ratio

**2. *Using Prior Drug Trafficking Convictions to Define Career Offenders.***

The SRA directs the Commission to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized by statute" for offenders who are at least 18 years old and who have been convicted of a crime of violence or a drug trafficking offense, and who previously have been convicted of two or more such offenses. The Commission implemented this directive by creating USSG §4B1.1, the "career offender" guideline. It places each offender with three violent or drug trafficking convictions in the highest criminal history category VI, and sets the offense level at the guideline range associated with the statutory maximum penalty for the offense.

In 2000, there were 1,279 offenders subject to the career offender provisions, which resulted in some of the most severe penalties imposed under the guidelines. Although Black offenders constituted just 26 percent of the offenders sentenced under the guidelines in 2000, they were 58 percent of the offenders subject to the severe penalties required by the career offender guideline. Most of these offenders were subject to the guideline because of the inclusion of drug trafficking crimes in the criteria qualifying offenders for the guideline. (Interestingly, Hispanic offenders, while

133

representing 39 percent of the criminal docket, represent just 17 percent of the offenders subject to the career offender guideline.) Commentators have noted the relative ease of detecting and prosecuting offenses that take place in open-air drug markets, which are most often found in impoverished minority neighborhoods (Tonry, 1995), which suggests that African-Americans have a higher risk of conviction for a drug trafficking crime than do similar White drug traffickers (Tonry, 1995; Blumstein, 2000).

The question for policymakers is whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of sentencing. Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else.

Most importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent. The recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual*. The career offender guideline thus makes the criminal history category a *less* perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses.

There may be other rules that have unwarranted adverse impacts on minority groups without clearly advancing a purpose of sentencing. The use of some non-moving traffic violations in the calculation of the criminal history score is one such possibility but there are many others (Blackwell, 2003). Continued research on how well different rules that result in adverse impacts are fulfilling the purposes of sentencing will improve both the fairness and the effectiveness of federal sentencing.

# E. Conclusion

The federal criminal justice system must be both fair and perceived to be fair. A central aspect of fairness in America's multi-racial and multi-ethnic society is equal treatment under law, without regard to race, ethnicity, or gender. America's special concern with racial justice helped lead to the creation of a sentencing system based on racially neutral rules. Evaluating the success of this system at eliminating any vestige of discrimination must be a central component of evaluating the guidelines.

For these reasons, it is troubling that reports of continuing racial, ethnic, and gender discrimination continue to appear in newspaper stories and in academic journals. Such reports understandably undermine public confidence in the federal courts, particularly among minority groups. Public confidence also is threatened by data showing that the gap in average sentences between African-American and other offender groups grew wider in the years following implementation of the guidelines and mandatory minimum penalty statutes enacted shortly after passage of the SRA. These findings deserve the careful attention of policymakers.

To be useful to policymakers, evidence of continuing sentencing disparities must be both accurate and informative concerning *how* and *where* in the criminal justice process disparities arise, and whether they are justified by differences in the seriousness of the offenses committed by the members of each group or by other case characteristics that are important to achieving the purposes of law enforcement. The review of evidence in this chapter suggests that the importance of discrimination by judges has been exaggerated by the existing research, while other stages of the criminal justice process have been relatively neglected, in part because of the paucity of data that can be used to investigate them.

The evidence shows that if unfairness continues in the federal sentencing process, it is more an "institutionalized unfairness" (Zatz, 1987; Tonry, 1996) built into the sentencing rules themselves rather than a product of racial stereotypes, prejudice, or other forms of discrimination on the part of judges. Most of the difference between the average sentences of Blacks, Whites, and Hispanics is an impact of the offense and offender characteristics that have been made relevant to sentencing by the guidelines and the mandatory minimum penalty statutes.

Despite the Commission's efforts to equalize the treatment of certain crimes, such "white collar" and "street" crimes involving similar economic harms, increasingly severe treatment of other crimes, particularly drug offenses and repeat offenses, has widened the gap among different offender groups. Today's sentencing policies, crystalized into the sentencing guidelines and mandatory minimum statutes, have a greater adverse impact on Black offenders than did the factors taken into account by judges in the discretionary system in place immediately prior to guidelines implementation. Attention might fruitfully be turned to asking whether these new policies are necessary to achieve any legitimate purpose of sentencing.